**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| BRIAN M. R., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:17-00661-JPG-CJP |
| | ) |
| ACTING COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Brian M. R. seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff filed for DIB on June 6, 2013, alleging a disability onset date of June 1, 2007. (Tr. 158-61.) Plaintiff's claim was denied initially, and again at the reconsideration level. (Tr. 79-98.) Plaintiff requested an evidentiary hearing, which Administrative Law Judge (ALJ) Barry H. Jenkins conducted in December 2014. (Tr. 109-10, 38-78.) ALJ Jenkins issued an unfavorable opinion in October 2015 and the Appeal's Council denied plaintiff's request for review, rendering the ALJ's decision the final agency decision. (Tr. 19-33, 1-4.) Plaintiff exhausted all of his administrative remedies and filed a timely complaint with this Court. (Doc. 1.)

## Plaintiff's Arguments

Plaintiff makes the following arguments:

1. The ALJ improperly found that plaintiff's impairments did not meet or equal a Listing.

1

2. The ALJ's credibility determination was erroneous.

**<u>Legal Standards</u>**

To qualify for benefits, a claimant must be "disabled" pursuant to the Social Security Act. The Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must result from a medically demonstrable abnormality. 42 U.S.C. § 423(d)(3). Moreover, the impairment must prevent the plaintiff from engaging in significant physical or mental work activity done for pay or profit. 20 C.F.R. § 404.1572.[1]

Social Security regulations require an ALJ to ask five questions when determining whether a claimant is disabled. The first three questions are simple: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe physical or mental impairment; and (3) whether that impairment meets or is equivalent to one of the listed impairments that the regulations acknowledge to be conclusively disabling. 20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the answers to these questions are "yes," then the ALJ should find that the claimant is disabled. *Id.*

At times, an ALJ may find that the claimant is unemployed and has a serious impairment, but the impairment is neither listed in nor equivalent to the impairments in the regulations— failing at step three. If this happens, then the ALJ must ask a fourth question: (4) whether the claimant is able to perform his or her previous work. *Id.* If the claimant is not able to, then the

---

[1] The legal standards for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) are largely the same. The above paragraph in this order cites the relevant statutory provisions for DIB, while the SSI provisions are located at 42 U.S.C. §§ 1382c(a)(3)(A), 1382c(a)(3)(D), and 20 C.F.R. § 416.972. Most citations herein are to the DIB regulations out of convenience, but also apply to SSI challenges.

burden shifts to the Commissioner to answer a fifth and final question: (5) whether the claimant is capable of performing *any* work within the economy, in light of the claimant's age, education, and work experience. If the claimant cannot, then the ALJ should find the claimant to be disabled. *Id.*; *see also Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

A claimant may appeal the final decision of the Social Security Administration to this Court, but the scope of review here is limited: while the Court must ensure that the ALJ did not make any errors of law, the ALJ's findings of fact are conclusive as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable person would find sufficient to support a decision. *Weatherbee*, 649 F.3d at 568 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The Court takes into account the entire administrative record when reviewing for substantial evidence, but it does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). But even though this judicial review is limited, the Court should not and does not act as a rubber stamp for the Commissioner. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

### **The ALJ's Decision**

ALJ Jenkins followed the five-step analytical framework set forth above. He determined plaintiff met the insured status requirements through December 31, 2012 and had not engaged in substantial gainful activity since June 1, 2007, the alleged onset date. Plaintiff had severe impairments of bilateral radiculopathy, hepatitis C, sensorineural hearing loss with occasional tinnitus, schizophrenia, and anxiety related disorder. (Tr. 24.) None of these impairments met or

equaled a Listing. (Tr. 25-27.) Plaintiff had the RFC to perform light work with several additional limitations, which prevented him from performing any past relevant work. (Tr. 27-31.) However, jobs existed in the national economy that plaintiff could perform and, therefore, he was not disabled. (Tr. 32-33.)

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

In his agency forms, plaintiff indicated that schizophrenia and bilateral radiculopathy prevented him from maintaining employment. (Tr. 186.) Aside from describing his previous employment and listing current medications, plaintiff did not provide details of his activities of daily living or how his impairment affected his functioning.

2. **Medical Records**

Plaintiff was incarcerated from roughly June 2010 to June 2011, which encompasses a portion of the alleged disability period. (Tr. 507, 524.) While incarcerated, plaintiff was referred to a psychiatrist, but he was released from custody before he could pursue treatment. (Tr. 502.) In June 2011, immediately following his release, plaintiff began treatment for substance abuse; mood disorder, mixed, with psychotic features; schizoaffective disorder; and post-traumatic stress disorder (PTSD) at the Veterans Affairs (VA) Hospital. (Tr. 501.) He reported he heard voices since he was a teenager, which had become more intrusive in the previous ten years. Plaintiff attempted to "drown" the voices with alcohol and made several suicide attempts. (Tr. 318.) He was arrested numerous times for possession of drugs and paraphernalia. He also had

4

multiple driving under the influence charges. (Tr. 522.) Plaintiff was the victim of military rape, which also contributed to his alcohol and drug abuse. (Tr. 456.) He had PTSD related to an army incident where he detonated a bomb that accidentally killed eleven military army trainees during a simulated combat training. (Tr. 503.) Throughout the record, plaintiff consistently reported nightmares, flashbacks, anxiety, mood fluctuation, waking up sweating, hypervigilance, being startled by loud sounds, "numbing experience," auditory hallucinations, and avoidant behavior. He attended therapy sessions, including programs aimed at PTSD, substance abuse, and anger management.

Plaintiff's treating physician was Dr. Priscilla Cusi. She prescribed plaintiff several medications to control his mental impairments, including Seroquel, Ziprasidone, Zolpidem, Risperidone, and Quetiapine. Plaintiff regularly followed-up with Dr. Cusi for mental status examinations. She categorized plaintiff's nightmares, flashbacks, anxiety, mood fluctuation, and substance abuse as "chronic" conditions for which "care is necessary throughout the lifespan." (Tr. 455-56.)

Plaintiff underwent a mental status exam on June 15, 2011. He was cooperative and did not demonstrate hostility or agitation. He was alert and oriented, times three. Plaintiff described his mood as generally manic and depressive. His affect was appropriate to content, expressed within normal limits. His thought process was linear and focused, with no looseness of association. He denied suicidal or homicidal ideation, delusion, illusion, and hallucination. His insight was fair and his judgment was marginal, due to gambling issues. His memory was intact and his fund of knowledge was average. (Tr. 522-24.)

On June 29, 2011, a mental status exam demonstrated a coherent and goal-directed thought process, irritable affect, and fair insight and judgment. Plaintiff's thought content was

5

focused on his mood fluctuation and insomnia. He reported vague suicidal ideation of not wanting to be around anymore. Plaintiff described his mood as "poor and no good outlook." He denied psychosis, altered perceptions, and homicidal ideation. He was cognitively, grossly intact. Dr. Cusi prescribed Quetiapine. (Tr. 507-10.)

On August 3, 2011, a mental status exam showed a coherent and goal-directed thought process, appropriate affect, and poor to fair insight and judgment. Plaintiff's thought content was focused on his mood fluctuation and nightmares. He described his mood as "less depressed and more hopeful" and denied psychosis, altered perception, and suicidal and homicidal ideations. He was cognitively, grossly intact. Dr. Cusi noted that plaintiff's mood continued to fluctuate, his sleep patterns were slowly improving, and his PTSD symptoms remained pronounced. She increased his Quetiapine. (Tr. 480-82.)

On September 14, 2011, plaintiff underwent a mental status exam that revealed a coherent and goal-directed thought process, an appropriate affect, and poor to fair insight and judgment. His thought content was focused on his nightmares and he described his mood as "less depressed and more hopeful." He was grossly, cognitively intact and denied psychosis, altered perception, and suicidal and homicidal ideation. His sleep and mood pattern continued to fluctuate and his PTSD symptoms remained pronounced. Dr. Cusi continued plaintiff's Quetiapine. (Tr. 457-60    )

On June 22, 2012, plaintiff's judgment and insight appeared fair and he denied any homicidal or suicidal ideation. His mood and affect were anxious. (Tr. 409-10.)

On June 27, 2012, plaintiff was cooperative, not hostile, and demonstrated no agitation during a mental status exam. He described his mood as generally manic and depressive. His affect was appropriate to content, expressed and within normal limits. His though process was

6

linear, focused, and he had no looseness of association. He denied suicidal and homicidal ideation and delusion. His insight was good, his memory intact, and his fund of knowledge average. His judgment was marginal due to gambling issues. His sleep and mood pattern continued to fluctuate and his PTSD symptoms remained pronounced. (Tr. 384-96.)

On July 27, 2012, plaintiff followed-up with Dr. Cusi. A mental status exam demonstrated a coherent and goal-directed thought process, appropriate affect, and poor to fair insight and judgment. His thought content was focused on his relapse and taking charge of his life; he denied psychosis, altered perceptions, and suicidal and homicidal ideation; his mood was "pretty good"; and he was cognitively, grossly intact. Dr. Cusi noted that his sleep and mood pattern continued to fluctuate and his PTSD symptoms remained pronounced. Dr. Cusi increased plaintiff's prescription for Ziprasidone and started him on Zolpidem. (Tr. 365-68.)

Plaintiff saw Dr. Cusi on September 27, 2012. He was participating in a drug rehab program and was seven months sober. He reported he could only take low doses of Ziprasidone but acknowledged that he needed it. A mental status exam demonstrated a coherent and goal-directed thought process, appropriate affect, and poor to fair insight and judgment. His thought content was focused on his relapse and taking charge of his life; he denied psychosis, altered perceptions, and suicidal and homicidal ideation; his mood was "pretty good"; and he was cognitively, grossly intact. Dr. Cusi noted that his sleep and mood pattern continued to fluctuate and his PTSD symptoms remained pronounced. She continued his prescriptions for Ziprasidone and Zolpidem. (Tr. 348-51.)

Plaintiff followed-up with Dr. Cusi on December 12, 2012. He was ten months sober and joined a rehab program. He reported he could only tolerate lower doses of Ziprasidone because of cramping in his hands and toes. A mental status exam demonstrated a coherent and goal-

directed thought process, appropriate affect, and poor to fair insight and judgment. His thought content was focused on his education; he denied psychosis, altered perceptions, and suicidal and homicidal ideation; his mood was "pretty good"; and he was cognitively, grossly intact. Dr. Cusi noted his sleep and mood pattern continued to fluctuate and his PTSD symptoms remained pronounced. She started plaintiff on Risperidone and continued his Zolpidem. (Tr. 339-42.)

On January 23, 2013, plaintiff followed-up with Dr. Cusi. He was eleven months sober and still participating in the drug rehab program. A mental status exam demonstrated a coherent and goal-directed thought process, appropriate affect, and poor to fair insight and judgment. His thought content was focused on his education; he denied psychosis, altered perceptions, and suicidal and homicidal ideation; his mood was "pretty good"; and he was cognitively, grossly intact. Dr. Cusi noted his sleep and mood pattern continued to fluctuate and his PTSD symptoms remained pronounced. She continued his Risperidone and Zolpidem, instructed him to continue participating in the drug rehab program, and recommended counseling. (Tr. 334-36.)

As of July 18, 2013, plaintiff was sixteen months sober and had completed the drug rehab program. He was also regularly attending Alcohol Anonymous (AA) meetings. A mental status examination revealed plaintiff had an appropriate affect but was tearful at times, had poor to fair insight and judgment, and was grossly, cognitively intact. His thought process was coherent and goal-directed. His thought content was focused on his education. He reported intrusive auditory hallucinations that made derogatory comments and commands. Plaintiff described his mood as "struggling and I am 2/10." Dr. Cusi noted plaintiff's sleep and mood patterns continued to fluctuate, his PTSD symptoms remained pronounced, and his auditory hallucinations were prominent and chronic. She prescribed him Risperidone and Zolpidem and recommended counseling. (Tr. 318-21.)

8

On November 8, 2013, plaintiff indicated he grew angrier each day about being sexually violated in the military. A mental status exam showed his thought process was coherent and goal-directed. His thought content was focused on his activities. He reported auditory hallucinations that sometimes made derogatory comments and commands. He denied suicidal and homicidal ideation. Plaintiff described his mood as "struggling and I am 2/10." His affect was appropriate and tearful at times. He was cognitively, grossly intact and his insight and judgment were poor to fair. Dr. Cusi noted plaintiff's sleep and mood patterns continued to fluctuate, his PTSD symptoms remained pronounced, and his auditory hallucinations were prominent and chronic. She increased plaintiff's prescription for Risperidone, continued his Zolpidem, recommended counseling, referred him to a PTSD class, and instructed plaintiff to continue to attend AA meetings. (Tr. 295-99.)

### 3. Opinion Evidence

State agency consultant Dr. Pastora Roldan conducted a psychiatric review technique in December 2013. Dr. Pastora opined plaintiff had the following "A" criteria of Listing 12.04 (Affective Disorders): bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and syndromes, and currently characterized by either or both syndromes. Plaintiff had the following "A" criteria of Listing 12.06 (Anxiety-Related Disorders): recurrent and intrusive recollections of a traumatic experience, which are the source of marked distress. Dr. Pastora opined there was insufficient evidence to establish the presence of the "B" or "C" criteria for those listings. (Tr. 85.)

Dr. Cusi completed a mental RFC assessment of plaintiff in January 2014. She opined plaintiff had moderate and marked limitations in the categories of Understanding & Memory; moderate, marked, and extreme limitations in Sustained Concentration & Persistence; slight,

moderate, and marked limitations in Social Interaction; and moderate and marked limitations in Adaptation. Dr. Cusi stated she had treated plaintiff since June 2011 and plaintiff had the above limitations since his teenage years. (Tr. 789-92.)

On January 7, 2014, the VA opined plaintiff was seventy percent disabled due to PTSD with schizoaffective disorder and substance abuse in remission. Other physical impairments accounted for another thirty percent disability, rendering plaintiff totally disabled. (Tr. 382-41.)

Dr. Torigoe, another state agency consultant, conducted a psychiatric review technique in May 2014 and affirmed Dr. Pastora's opinions. (Tr. 95.)

### 4. Evidentiary Hearing

ALJ Jenkins conducted an evidentiary hearing in 2015, at which plaintiff was represented by counsel. Plaintiff testified he lived with his mother and brother. (Tr. 47.) After being released from prison in June 2011, plaintiff tested positive for methamphetamine. He spent an additional fifty-two days in jail in 2012 for that parole violation. (Tr. 49-50.) Plaintiff was in the army in the late 1980's and early 1990's. He was honorably discharged after sustaining an injury to his thumb. (Tr. 50.)

Plaintiff left his home for necessities. He went to the VA, the grocery store, and weekly AA meetings. (Tr. 60-61.) Plaintiff watched television throughout the day. He did not sleep well because of army-related nightmares. (Tr. 62-63.) Plaintiff did not have friends but the ladies at AA were nice to him. (Tr. 68-69.)

## Analysis

Plaintiff argues the ALJ erroneously evaluated whether he met Listing 12.06 for anxiety related disorders.

Listing 12.06, relevant here, has three categories of criteria, labeled, "A," "B," and "C." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06. A claimant meets the Listing when he fulfills the requirements in both A and B, or both A and C. *Id.* A claimant can meet the requirements of Criteria A if he has "[r]ecurrent and intrusive recollections of a traumatic experience, which are a source of marked distress." *Id.* A claimant meets the requirements of Criteria B if those recurrent and intrusive recollections result in at least two of the following: marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. Finally, a claimant meets Criteria C if those recurrent and intrusive recollections result in a "complete inability to function independently outside the area of one's home." *Id.*

Here, the ALJ determined plaintiff did not meet Criteria B or C. According to the ALJ, plaintiff did not meet Criteria B because he had only mild restrictions in activities of daily living; moderate difficulties in social functioning; and moderate difficulties with concentration, persistence, or pace. These opinions conflict with the opinions of plaintiff's treating physician, Dr. Cusi, who opined plaintiff was at least markedly limited in all of these areas of functioning.

The Social Security Regulations require an ALJ to afford controlling weight to a treating source's opinion, so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527. Otherwise, the ALJ must identify "good reasons" for rejecting the opinion and assess it against the following factors: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; and (5) the physician's specialization. *Id.*

11

ALJ Jenkins gave Dr. Cusi's opinion "partial weight" because it "overstates the claimant's limitations, lacks substantial support from the mental health records covering the period in question, and fails to provide a function-by-function analysis of the claimant's capabilities." Moreover, the ALJ states, "Dr. Cusi's personal clinical notes do note [sic] validate the severity of her assessed mental limitations, and she did not describe the medical or clinical findings that support her assessment." Finally, the ALJ doubted Dr. Cusi because her opinion that plaintiff's limitations date back to his teenage years is inconsistent with his "decades of work at substantial gainful activities levels." (Tr. 30.)

This analysis is both substantively and procedurally erroneous. To start, the ALJ makes several blanket assertions that are so poorly articulated they are unreviewable. For instance, the ALJ says Dr. Cusi's own records do not validate her opinion and the opinion lacks support from the record as a whole. However, the ALJ does not identify what parts of the record he relied on to reach these conclusions. *See Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) (reversing an ALJ's decision where he did not adequately articulate his reasoning for rejecting a treating source's opinion). This error is especially egregious because even a cursory review of the medical evidence calls the ALJ's statements into question. The record is riddled with evidence that plaintiff experienced daily auditory hallucinations, struggled with substance abuse, and experienced multiple traumatic experiences that would account for his pronounced PTSD symptoms. Moreover, plaintiff regularly attended anger management, AA, and other counseling sessions to combat his impairments. In addition, plaintiff took antipsychotic and hypnotic medications to alleviate his symptoms. In sum, there appears to be no want of evidence to support Dr. Cusi's opinions.

Although the court does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner, we nonetheless conduct a critical review of the evidence. The ALJ must adequately discuss the issue and must build an accurate and logical bridge from the evidence to his conclusions." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). Here, the ALJ clearly fails to logically connect the evidence to his conclusions. "[W]here the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

The ALJ also erroneously discredits Dr. Cusi's opinion for failing "to provide a function-by-function analysis of the claimant's capabilities." (Tr. 30). As set forth above, the Regulations require a treating source opinion to be "well-supported" and "not inconsistent with other substantial evidence in the record." 20 C.F.R. § 404.1527. Neither the Regulations, nor Seventh Circuit case law, requires a treating source to articulate a function-by-function mental RFC. This facet of the ALJ's assessment was in error as well.

Finally, the ALJ analysis erroneously strays from the Regulations' specific method for evaluating treating source opinions. That method consists of two "separate and distinct steps." *Williams v. Berryhill*, 2018 WL 264201, at *3 (N.D. Ill. Jan. 2, 2018). The ALJ must first determine whether the source's opinion is entitled to controlling weight in consideration of supportability and consistency with the record. If the ALJ finds the opinion is lacking in either of these aspects, the ALJ must proceed to step two, where he applies the checklist of factors articulated in 20 C.F.R. § 404.1527. The ALJ uses these factors to determine exactly what weight to assign to the opinion.

The ALJ, here, conflates the two steps and gives no consideration to the regulatory factors; many of which weigh in favor of affording more weight to Dr. Cusi's opinion. For instance, Dr. Cusi treated plaintiff for several years, and on numerous occasions, before rendering her opinion, specialized in psychiatry, and conducted mental status examinations at each appointment. *See* 20 C.F.R. § 404.1527 (the ALJ must consider the length, nature, and extent of the treatment relationship along with the physician's specialty and the supportability of the opinion).

For the above reasons, the case is remanded to the ALJ for rehearing and re-decision. On remand, the ALJ must sufficiently articulate his reasons for accepting or rejecting evidence and follow the Regulations' process for weighing a treating source's opinion. Additionally, the ALJ should be cautious to use plaintiff's work history to discredit Dr. Cusi's opinions. *See Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013) (claimants may work full time without being capable of substantial gainful activity due to desperation or "a lenient or altruistic employer.").

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE: JUNE 12, 2018**

s/ *J. Phil Gilbert*
**J. PHIL GILBERT**
**DISTRICT JUDGE**
